**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO.  2:21-CV-00246-JRG |
| PNC BANK N.A., | § § | |
| *Defendant*. | § § § | |

## CLAIM CONSTRUCTION MEMORANDUM AND ORDER

Before the Court is the Opening Claim Construction Brief (Dkt. No. 50) filed by Plaintiff United Services Automobile Association ("Plaintiff" or "USAA").  Also before the Court is the Responsive Claim Construction Brief (Dkt. No. 62) filed by Defendant PNC Bank, N.A. ("Defendant" or "PNC") as well as Plaintiff's reply (Dkt. No. 64).

The Court held a hearing on March 2, 2022.

- 1 -

Table of Contents

I. BACKGROUND ...................................................................................................... 3

II. LEGAL PRINCIPLES .......................................................................................... 4

III. AGREED TERMS ................................................................................................. 9

IV. DISPUTED TERMS IN U.S. PATENT NO. 9,224,136 ................................... 10

   1. "check amount indication" ............................................................................. 10

   2. "signature identification procedure" ............................................................. 15

   3. "check deposit" ............................................................................................... 18

V. DISPUTED TERMS IN U.S. PATENT NO. 10,402,638 .................................. 20

   4. "A system . . . causing the customer's handheld mobile device to perform the following steps" ................................................................................................ 20

   5. "A system . . . the app associated with a bank and causing the customer's handheld mobile device to perform" ........................................................................ 25

   6. "the system configured to authenticate the customer using data representing a customer fingerprint" ............................................................................................ 26

   7. "check for errors" .......................................................................................... 29

   8. "Personal Digital Assistant (PDA)" ............................................................. 32

VI. DISPUTED TERMS IN U.S. PATENT NO. 10,769,598 ................................. 35

   9. "method of facilitating remotely depositing funds into a user's account with a bank's computing system and without using an Automatic Teller Machine (ATM)," "A method of facilitating remotely depositing funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)," and "A system for facilitating remote deposit of funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)" ............................ 35

   10. "electronic indication of the value" and "accept or determine amount data indicative of an amount of the check from the user owned device" ........................................ 41

   11. "receiving the electronic indication of the value as an embedded aspect of the at least one electronic image" ................................................................................ 43

VII. CONCLUSION .................................................................................................. 45

## I.     BACKGROUND

USAA alleges infringement of United States Patents Nos. 9,224,136 ("the '136 Patent"),

10,402,638 ("the '638 Patent"), and 10,769,598 ("the '598 Patent") (collectively, "the patents-in-

suit").  (Dkt. No. 50, Exs. 7–9).

USAA submits that the patents-in-suit are related to patents that the Court construed in

prior cases, and in the *Wells Fargo II* case the Court construed disputed terms in the '136 Patent:

> *United Services Automobile Association v. Wells Fargo Bank, N.A.*, No. 2:18-CV-
> 366, Dkt. No. 57 (E.D. Tex. July 29, 2019) ("*Wells Fargo*" or "*Wells Fargo II*");
> and
>
> *United Services Automobile Association v. PNC Bank, N.A.*, No. 2:20-CV-319, Dkt.
> No. 265 (E.D. Tex. Nov. 22, 2021) ("*PNC I*").

The '136 Patent, titled "Systems and Methods for Remote Deposit of Checks," issued on

December 29, 2015, and bears an earliest priority date of October 31, 2006.  The Abstract of the

'136 Patent states:

> Remote deposit of checks can be facilitated by a financial institution.  A customer's
> general purpose computer and image capture device may be leveraged to capture
> an image of a check and deliver the image to financial institution electronics.
> Additional data for the transaction may be collected as necessary.  The transaction
> can be automatically accomplished utilizing the images and data thus acquired.

The '638 Patent, titled "Digital Camera Processing System," issued on September 3, 2019,

and bears an earliest priority date of October 31, 2006.  The Abstract of the '638 Patent states:

> A digital camera processing system with software to manage taking photos with a
> digital camera.  Camera software controls the digital camera.  A downloaded
> software component controls the digital camera software and causes a handheld
> mobile device to perform operations.  The operations may include instructing a user
> to have the digital camera take photos of a check; displaying an instruction on a
> display of the handheld mobile device to assist the user in having the digital camera
> take the photos; or assisting the user as to an orientation for taking the photos with
> the digital camera.  The digital camera processing system may generate a log file
> including a bi-tonal image formatted as a TIFF image.

The '598 Patent, titled "Systems and Methods for Remote Deposit of Checks," issued on September 8, 2020, and bears an earliest priority date of October 31, 2006.  The Abstract of the '598 Patent states:

> Remote deposit of checks can be facilitated by a financial institution.  A customer's general purpose computer and image capture device may be leveraged to capture an image of a check and deliver the image to financial institution electronics. Additional data for the transaction may be collected as necessary.  The transaction can be automatically accomplished utilizing the images and data thus acquired.

## II.   LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period."  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted).  "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.  These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal."  *Id.* (citing 517 U.S. 370).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make

and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent

application." *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art.  *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314–17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent.  *Id.* at 1317.  However,

because the file history "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court rejected the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319–24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323–25. Rather, *Phillips* held that a court must attach the appropriate

weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus*, 572 U.S. 898. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because of issue

- 8 -

preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III.   AGREED TERMS

In their December 8, 2021 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 47, Ex. A) and in their February 2, 2022 P.R. 4-5(d) Joint Claim Construction Charts (Dkt. No. 66-1), the parties submitted the following agreements:

| Term | Agreed Construction |
|---|---|
| "A system for processing a check deposit" ('136 Patent, Claim 14) | Preamble is limiting |
| '638 Patent Preambles ('638 Patent, Claims 1, 20, 23, 28)<br><br>"A system for allowing a customer to deposit a check using a customer's own handheld mobile device, the system including"<br><br>"A system for allowing a customer to deposit a check using a customer's handheld mobile device, the system configured to authenticate the customer using data representing a customer fingerprint, the system including"<br><br>"A system for allowing a customer to deposit a check using a customer's own handheld mobile device with a digital camera, the system configured to authenticate the customer using data representing a customer fingerprint, the system including"<br><br>"A system for allowing a customer to deposit a check using a customer's own handheld mobile device, the system including" | Preambles are limiting |

| "deposit a check"<br>('638 Patent, Claims 1, 20, 23, 28)<br><br>"mobile check deposit"<br>('638 Patent, Claims 1, 14, 15, 20, 26, 28) | "[perform] a transaction involving provision of a check [using a mobile device] to a depository in a form sufficient to allow money to be credited to an account" |
|---|---|

## IV.    DISPUTED TERMS IN U.S. PATENT NO. 9,224,136

### 1. "check amount indication"

| "check amount indication"<br>('136 Patent, Claims 1, 7) | |
|---|---|
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary | "an indication of the check amount distinct from the amounts visible in the check image" |

(Dkt. No. 47, Ex. B, at 1; Dkt. No. 66, Ex. A1, at 2.)

(a)  The Parties' Positions

USAA argues that "there is no dispute that the claims require receiving both a 'check amount indication' and a 'check image,'" "[b]ut it is not the case that the two are necessarily completely 'distinct,' as PNC's proposed construction seems to suggest." (Dkt. No. 50 at 2.) "For example," USAA argues, "the 'check amount indication' may be received separately or embedded in the received check image, as reflected by other claims in the same patent family." (*Id.* (citing '598 Patent, Cls. 1, 8).)

PNC responds that "[t]his claim term requires construction because USAA seeks to read it out of the claims entirely," and "[a] 'check amount indication' must come from something other than the check image itself." (Dkt. No. 62 at 3.)  PNC cites Claim 6, which recites "determine a check amount from the check image" and "compare the check amount determined from the check

image with the received check amount indication," and PNC argues that "[b]ecause 'compare' necessarily involves looking for differences or similarities between two or more things, the 'check amount from the check image' must be distinct from the 'check amount indication'; otherwise, there would be nothing to 'compare.'"  (*Id.*)  PNC further urges: "The specification . . . demonstrates that 'check amount indication' is a customer-entered amount that is distinct from the amount determined from using OCR on the check image's check amount location.  By comparing these two distinct sources of information, the system may flag an error if the two amounts do not match up."  (*Id.* at 4.)

USAA replies that "the standard for disclaimer is extremely high," and "[n]othing in the specification forbids the 'check amount indication' being connected, directly or indirectly, to the amount visible in the check image."  (Dkt. No. 64 at 1.)  As to dependent Claim 6 cited by PNC, USAA argues that "the comparison is between the results of two separate steps … [b]ut the existence of two separate steps does not limit how either if performed, much less preclude the use of OCR."  (*Id.*)

At the March 2, 2022 hearing, USAA submitted that, by arguing that this claim term refers to a customer-entered amount, PNC is attempting to import a particular embodiment from the specification.  PNC responded that because a "check amount indication" is recited separately in the claims, merely receiving a check image cannot by itself be sufficient to satisfy the requirement of receiving a "check amount indication."

(b)  Analysis

As a threshold matter, USAA argued at the March 2, 2022 hearing that the '598 Patent is intrinsic evidence because the '136 Patent states that it is "related by subject matter" to an ancestor application of the '598 Patent, namely United States Patent Application No. 11/590,974.  *See* '136

Patent at 1:17–23.  USAA's arguments in this regard, including USAA's reliance on the *EI du Pont* case, are unpersuasive because USAA has not shown that the '136 Patent incorporates by reference the '598 Patent or the specification thereof.  *See EI du Pont de Nemours & Co. v. UNIFRAX I LLC*, 921 F.3d 1060, 1069 (Fed. Cir. 2019) ("This court's precedent supports treating the specification of the '027 patent as intrinsic evidence in construing claims in the '926 patent, which issued from a continuation-in-part of the application for the '027 patent, because 'the subject matter is common to the continuation-in-part application.'") (citations omitted).

Turning to the claim language, Claims 1 and 6 of the '136 Patent, for example, recite (emphasis added):

> 1.  A system comprising:
>     a processor; and
>     a memory storing processor-executable instructions that, when executed by the processor, cause the processor to:
>         receive an account identification number, *check amount indication*, and *check image*, where the check image is an image of a check captured by a camera;
>         perform optical character recognition on the check image to determine a routing number for the check image;
>         validate the routing number for the check image; and
>         initiate a check deposit for the check image.
>
> * * *
>
> 6.  The system of claim 1, wherein the processor-executable instructions further cause the processor to:
>         determine a check amount *from the check image*; and
>         compare the check amount determined from the check image with the received *check amount indication*.

These claims do not recite how the "check amount indication" is generated.  The recital of a "check image" in the same claim limitation as a "check amount indication" does, however, weigh in favor of PNC's proposal that a "check amount indication" is distinct from the check image.

USAA submits that although "there is no dispute that the claims require receiving both a 'check amount indication' and a 'check image,'" USAA urges that "it is not the case that the two

are necessarily completely 'distinct'" because, for example, "the 'check amount indication' may be received separately or embedded in the received check image."  (Dkt. No. 50 at 2.)

The '598 Patent, although not directly related to the '136 Patent, can be considered as extrinsic evidence of the possibility of "receiving the electronic indication of the value as an embedded aspect of the at least one electronic image."  '598 Patent, Cl. 8.  Of note, PNC presents the same proposed construction for "electronic indication of the value" in the '598 Patent as PNC presents for "check amount indication" in the '136 Patent.

PNC does not appear to dispute that a "check amount indication" could be embedded in an image, but PNC emphasizes above-reproduced Claim 6 of the '136 Patent as reciting to "*compare* the check amount determined from the check image with the received check amount indication," which implies that the "check amount determined from the check image" is distinct from the "check amount indication."

This distinction is also consistent with disclosure in the specification regarding "check amount 303" being a "customer-entered amount."  '136 Patent at 10:53–56 ("OCR may further be performed on a check amount location 306, and the amount as determined using OCR may be compared against the customer-entered amount received pursuant to step 303."); *see id.* at 7:64–66 ("The customer may next be instructed to identify an amount of a check or other negotiable instrument he wishes to deposit into the selected account 203."); *see also id.* at Fig. 3 ("Receive Check Amount", "Perform OCR on Amount Location", and "Compare OCR-Determined Amount with Customer-Entered Amount").  PNC also urges: "That one would expect the amount indicated by the customer (the 'check amount indication') and the amount determined from the check image by OCR to be the same does not speak to from where those amounts originate."  (Dkt. No. 62 at

4.)  Likewise, the specification refers to "different amounts identified by the customer and the OCR process" as an "error."  '136 Patent at 13:21–24.

Nonetheless, PNC shows no definition or disclaimer that would warrant limiting the "check amount indication" to being entered by a customer rather than being obtained from a check image. *See Phillips*, 415 F.3d at 1323.  Although above-reproduced Claim 6 expressly recites steps of "determin[ing] a check amount from the check image" and "compar[ing] the check amount determined from the check image with the received check amount indication," this does not preclude the check amount indication from having been obtained from the check image.

The Court therefore expressly rejects PNC's argument that the "check amount indication" cannot be obtained from the check image.  Still, however, the "check amount indication" must be distinct from the check image.  By "distinct from," the Court does not mean that the check amount indication is necessarily different from the amount shown by the check image.  Rather, "distinct from" serves to clarify that the requirement of a "check amount indication" is not met merely by the check image itself (unless perhaps a check amount is determined and then a check amount indication is embedded as metadata within the check image, as discussed above, in which case the check amount indication still has its own distinct existence).

The Court accordingly construes **"check amount indication"** to mean **"an indication of the check amount, wherein the indication is distinct from the check image but may have been obtained from the check image or from some other source."**

### 2. "signature identification procedure"

| "signature identification procedure"<br>('136 Patent, Claim 14) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary | "A procedure to identify a mark as a signature" |

(Dkt. No. 47, Ex. B, at 1; Dkt. No. 66, Ex. A1, at 3.)

(a)  The Parties' Positions

USAA argues that "[r]ead in context, the specification is clearly using 'signature identification' in its normal sense, *i.e.*, identifying the particular signature on the check, for example 'to determine that the signature matches that of the payor or drafter of the check.'"  (Dkt. No. 50 at 3 (quoting '136 Patent at 10:2–6).)  "That is distinct," USAA argues, "from simply determining that some signature or other mark is present at an endorsement location, which is the embodiment recited in claim 14."  (*Id.* at 3–4.)

PNC responds that "[a]ny procedure that identifies a mark as a signature—as opposed to, for example, a graphic or typeface—is a signature identification procedure."  (Dkt. No. 62 at 6.)  PNC argues that in Claim 14, "the system is only looking to determine that a mark—and not a signature—is present," and PNC argues that "[t]he specification is in accord."  (*Id.*)  Further, PNC argues that "USAA is attempting to substitute 'identification' with 'verification' or 'matching.'"  (*Id.* at 7.)

USAA replies that "the distinction between the two embodiments is based on whether the system is attempting to read the signature on the check as opposed to simply verifying that some type of mark or signature is present in the endorsement location where a signature would be expected."  (Dkt. No. 64 at 3.)  USAA urges that "PNC's interpretation, that the system may only

- 15 -

determine whether a 'mark' is present in the endorsement location but may not do anything to evaluate whether it looks like a signature, has no support in the intrinsic record." (*Id.*)

At the March 2, 2022 hearing, USAA argued that the specification says nothing about carving out from the claim scope any system that determines whether a signature is present. USAA urged that all that is being carved out of the claim scope are systems that attempt to identify if a known signature is present. USAA argued that PNC's proposal is inconsistent with the disclosed purpose of determining if the check is likely to be able to be deposited. PNC responded that the word "mark" is broader than the word "signature," and PNC argued that merely determining the presence of a *mark* is not a "*signature* identification procedure."

(b)  Analysis

Claim 14 of the '136 Patent recites (emphasis added):

14.  A system for processing a check deposit, comprising:
a plurality of processors, each having a memory associated therewith, configured to execute instructions to:
receive a customer identification of an account for a deposit;
receive an image of a front side of a check captured by a camera, wherein the image of the front side of the check is received from a remote device;
receive an image of a back side of the check captured by the camera, from the remote device;
process the image of the front side of the check to obtain deposit information for the check;
process the image of the back side of the check to determine whether a *mark* is present on the image of the back side of the check by:
determining whether a *mark* is present at an endorsement location in the image of the back side of the check without further performing a *signature identification procedure*; and
generate a log file, the log file comprising at least a portion of the deposit information for the check.

The specification discloses:

Another advantageous use of OCR is on the endorsement location on the back of a check. By performing OCR, it may be possible in some embodiments to determine

- 16 -

that the signature matches that of the payor or drafter of the check.[1]  However, often signatures are illegible.  Thus in one embodiment it is advantageous to *determine that some mark or signature is present in the endorsement location on the back of the check, without conducting any further signature identification procedures.*

'136 Patent at 9:65–10:6 (emphasis added).  As to this disclosure regarding "some mark or signature," PNC cites authority that "or" can be used to "designate[] that a series describes alternatives." *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199–1200 (Fed. Cir. 2013).

This disclosure in the specification distinguishes between a "signature" and a mere "mark," and this distinction is also consistent with the Court's own understanding of how these two different words have long been used in legal contexts.  Further, the specification demonstrates that the term "signature identification procedure" can encompass identifying whether a signature on a check matches a known signature.  *See* '136 Patent at 9:65–10:6.

This portion of the disclosure also, however, concludes by referring to "without conducting any *further* signature identification procedures."  *Id.* (emphasis added).  This use of the word "further" demonstrates that determining that a signature is *present* is itself a type of "signature identification procedure."  *See id.*  Finally, the word "mark" is broader than the word "signature," and whereas Plaintiff's interpretation of the disputed term as "identifying the particular signature on the check" implies the presence of a *signature*, the above-reproduced claim recites only a *mark* ("determining whether a mark is present").

The Court accordingly construes **"signature identification procedure"** to mean **"a procedure to determine the presence of a signature on the check or to determine that a signature on the check matches a particular known signature."**

---

[1] This reference to the signature of a "payor or drafter" is potentially confusing because this portion of the disclosure is referring to the endorsement area on the back of a check rather than referring to the front of the check, but this potential confusion does not affect the Court's analysis.

**3. "check deposit"**

| "check deposit"  ('136 Patent, Claims 1, 2, 7, 8, 14, 15) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| "a transaction involving provision of a check to a depository in a form sufficient to allow money to be credited to an account" | No further construction necessary. |

(Dkt. No. 47, Ex. B, at 1; Dkt. No. 66, Ex. A1, at 4.)

(a)  The Parties' Positions

USAA argues that the Court should apply the same construction as in prior cases involving related patents.  (Dkt. No. 50 at 4.)

PNC responds that "[n]o party in *Wells Fargo II* raised the issue before the Court in this case," "and USAA's proposed construction is simply contrary to the claim language and specification."  (Dkt. No. 62 at 8.)

USAA replies that "PNC has not sought an order of terms construction, nor is there any basis for one," and "there is no reason that initiation could not occur after the other claim steps." (Dkt. No. 64 at 3–4.)

(b)  Analysis

Claim 1 of the '136 Patent, for example, recites (emphasis added):

1. A system comprising:
     a processor; and
     a memory storing processor-executable instructions that, when executed by the processor, cause the processor to:
          receive an account identification number, check amount indication, and check image, where the check image is an image of a check captured by a camera;
          perform optical character recognition on the check image to determine a routing number for the check image;
          validate the routing number for the check image; and

initiate a *check deposit* for the check image.

The specification discloses:

> If the server determines that the delivered images and any corresponding data are sufficient to *go forward with the deposit*, the customer's account may be provisionally credited, and a confirmation page may be delivered to the customer.
>
> * * *
>
> If the routing number determined using OCR cannot be validated, an error may result 317, and the deposit transaction can be aborted.  An error message can be delivered to the customer 314, explaining a reason that the transaction could not be processed.

'136 Patent at 9:2–6 & 10:7–11 (emphasis added); *see id.* at 6:19–40 (regarding presenting and settling a check).

In *Wells Fargo II*, the Court found that "the patents teach that a check deposit necessarily involves submission of a check in a form sufficient to effect the crediting of funds to an account," and the Court construed "check deposit" to mean "a transaction involving provision of a check to a depository in a form sufficient to allow money to be credited to an account."  *Wells Fargo II* at 19.

PNC argues that the *Wells Fargo II* construction, "when applied to the asserted claims in the '136 patent, would lead to the nonsensical result that the disclosed system initiates a check deposit transaction *after* the system already began a check deposit transaction." (Dkt. No. 62 at 8) (emphasis in original).

PNC does not persuasively show any nonsensical result or internal inconsistency.  Rather, above-reproduced Claim 1 of the '136 Patent, for example, includes steps that could be performed *in addition* to providing the check image to a depository, such as validating the routing number that specifies where the check image will go *when deposited*.  Alternatively, and in addition, PNC's argument relies on reading the claim steps in order, and PNC fails to establish that "validat[ing]

the routing number for the check image" must necessarily be performed before "initiat[ing] a check deposit for the check image."  *See Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014) ("As a general rule, unless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one.") (internal quotation marks and citations omitted).  Disclosures regarding particular embodiments cited by PNC do not compel otherwise.  *See id.*; *see also* '136 Patent at Figs. 2–4.

The Court accordingly construes **"check deposit"** to mean **"a transaction involving provision of a check to a depository in a form sufficient to allow money to be credited to an account."**

## V.      DISPUTED TERMS IN U.S. PATENT NO. 10,402,638

## 4.  "A system . . . causing the customer's handheld mobile device to perform the following steps"

| **"A system . . . causing the customer's handheld mobile device to perform the following steps"**<br>('638 Patent, Claims 1, 20, 23) | |
|---|---|
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary.<br>Not indefinite. | Indefinite because it claims both a system and method steps |

(Dkt. No. 47, Ex. B, at 2; Dkt. No. 66, Ex. A2, at 7.)

(a)  The Parties' Positions

USAA argues that these claims are not improper mixed method-apparatus claims because the claims "employ the well-established approach of using functional claiming in a system claim— namely, describing the app in part by the functions that it is capable of causing the device to

perform." (Dkt. No. 50 at 5 (citations omitted).)  USAA also submits that "none of the claims require the user of the system to do anything in order for the claims to be infringed." (*Id.* at 7.)

PNC responds that "[t]he Court should find these claims indefinite for improperly combining a system and a method in one claim" because "each is a system claim that requires a customer to perform actions in order for the claim to be infringed." (Dkt. No. 62 at 10–11.)  That is, PNC argues: "[T]he recited steps in claims 1, 20, and 23 of the '638 patent cannot be mere 'functions' or 'capabilities' of the app because the claim *requires the app to cause those steps to be performed*.  And they cannot be performed without the user." (*Id.* at 14) (emphasis in original.)

USAA replies that "[a]s the Federal Circuit [has] recognized, it is entirely appropriate to define system components in part by the fact that they perform . . . functions in response to user input." (Dkt. No. 64 at 4 (discussing *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017).)  USAA urges: "If a system has an app programmed to cause a customer's handheld device to perform the recited functions (e.g., 'receiving input,' 'using a display . . . to assist the customer,' 'presenting the photo'), it satisfies the claim elements; if not, it does not.  [T]his determination can and is made when the system is made, independent of later user actions." (Dkt. No. 64 at 6.)  Finally, USAA submits that "PNC filed IPR petitions and declarations treating the claims as system claims drawn to purely functional capability, rather than mixed system/method claims." (*Id.* (citation omitted).)

At the March 2, 2022 hearing, PNC urged that there are two distinct mixed method-system problems presented by these claims, the first being the recital of user action and the second being the recital of actively performing steps, as addressed by the below-cited *Katz* and *Rembrandt* cases, respectively.  USAA responded that these claims are defined in terms of the configuration of the

downloaded app, not in terms of any actual performance of steps and not in terms of any user action.

(b)  Analysis

As a threshold matter, USAA cites two IPR petitions filed by PNC as to the '638 Patent (*see* Dkt. No. 50, Exs. 3 & 4), but those IPR petitions do not significantly affect the Court's analysis of the present dispute regarding indefiniteness.  *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 (Fed. Cir. 2020).

As to PNC's argument that the claims here at issue are improper mixed method-system claims, the Federal Circuit has explained:

> A single patent may include claims directed to one or more of the classes of patentable subject matter, but no single claim may cover more than one subject matter class.  *IPXL Holdings*[*, LLC v. Amazon.com, Inc.*], 430 F.3d [1377,] 1384 [(Fed. Cir. 2005)] (holding indefinite a claim covering both an apparatus and a method of using that apparatus).

*Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008); *see H-W Tech, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014) (finding claim indefinite because "it is unclear when infringement occurs").

Claim 1 of the '638 Patent recites (emphasis added):

1. *A system* for allowing a customer to deposit a check using a customer's own handheld mobile device, the system including:
   *a customer's handheld mobile device including a downloaded app, the app associated with a bank and causing the customer's handheld mobile device to perform the following steps*:
      receiving input entered by the customer indicating an amount of the check;
      after the receiving, instructing the customer to take a photo of the check;
      using a display of the customer's handheld mobile device to assist the customer in having a digital camera take the photo of the check;
      assisting the customer as to an orientation for taking the photo;

- 22 -

> > presenting the photo of the check to the customer after the
> > photo is taken; and
> > using a wireless network, transmitting a copy of the photo
> > over the Internet from the customer's handheld mobile
> > device and submitting the check for mobile check
> > deposit in the bank after presenting the photo of the
> > check to the customer;
> a bank computer programmed to update a balance of an account to reflect
> an amount of the check submitted for mobile check deposit by the customer's
> handheld mobile device;
> the system being configured to check for errors before the submitting is
> performed by the customer's handheld mobile device;
> the system being configured to confirm that the mobile check deposit can
> go forward after:
> > optical character recognition is performed on the check in
> > the photo, the optical character recognition including
> > determining an amount shown on the check, and
> > the amount determined by optical character recognition is
> > compared to the amount entered by the customer; and
> the system being configured to update the balance of the account after
> optical character recognition is performed on a Magnetic Ink Character Recognition
> (MICR) line of the check in the photo.

PNC discusses the above-cited *IPXL* case as well as *In re Katz Interactive Call Processing Litigation*, in which the Federal Circuit found claims indefinite that "create confusion as to when direct infringement occurs because they are directed both to systems and to actions performed by 'individual callers.'"  639 F.3d 1303, 1318 (Fed. Cir. 2011).  The *Katz* case does not compel finding indefiniteness in the present case because the claims at issue in *Katz* recited actions performed by individual users.  In the present case, above-reproduced Claim 1 of the '638 Patent recites configuration of the system and of the "downloaded app" so as to interact with a user in the particular recited manner.  The recital of the word "causing," which PNC emphasizes, is fairly read as referring to configuration of the system rather than being a method step, particularly when read in the context of the grammatical structure of the surrounding language.  *See* '638 Patent at Cl. 1 ("the app . . . causing the customer's handheld mobile device to perform the following

steps"). Likewise, "receiving input entered by the customer indicating an amount of the check" is recited as part of the configuration of the "downloaded app," not as a method step.

As for the *Rembrandt* case cited by PNC, the claim there at issue recited:

3. A data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising:
      first buffer means for partitioning said stream into frames of unequal number of bits and for separating the bits of each frame into a first group and a second group of bits;
      fractional encoding means for receiving the first group of bits of each frame and performing fractional encoding to generate a group of fractionally encoded bits;
      second buffer means for combining said second group of bits with said group of fractionally encoded bits to form frames of equal number of bits;
      trellis encoding means for trellis encoding the frames from said second buffer means; and
      *transmitting the trellis encoded frames*.

*Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (emphasis added).

Whereas this claim that was at issue in *Rembrandt* thus recited a distinct method step, the above-reproduced claim in the present case recites "permissible functional language used to describe capabilities of the" downloaded app. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1315 (Fed. Cir. 2017); *see Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *see also UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016).

A similar analysis applies to Claims 20 and 23, which similarly recite a "downloaded app" configured to perform certain operations, including assisting the user in taking a photo of a check.

The Court therefore expressly rejects PNC's indefiniteness challenge, and PNC presents no alternative proposed construction. The Court accordingly construes **"A system . . . causing the customer's handheld mobile device to perform the following steps"** to have its **plain and ordinary meaning**.

**5. "A system . . . the app associated with a bank and causing the customer's handheld mobile device to perform"**

| "A system . . . the app associated with a bank and causing the customer's handheld mobile device to perform" ('638 Patent, Claim 28) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. Not indefinite. | Indefinite because it claims both a system and method steps |

(Dkt. No. 47, Ex. B, at 2; Dkt. No. 66, Ex. A2, at 9.)

(a)  The Parties' Positions

USAA argues that this claim is not indefinite for the same reasons argued as to Claims 1, 20, and 23, above.  (Dkt. No. 50, at 10.)

PNC incorporates its arguments as to Claims 1, 20, and 30 (discussed above) and argues that "Claim 28 does not merely require a system that is capable of performing certain steps, but requires the app to cause the mobile device to perform steps that require user action in order to be completed."  (Dkt. No. 62, at 15.)

USAA replies as to this claim together with Claims 1, 20, and 23, which are discussed above.  (*See* Dkt. No. 64, at 4–6.)

(b)  Analysis

The same analysis applies to Claim 28 of the '638 Patent as set forth above regarding Claims 1, 20, and 23 of the '638 Patent.  Here, too, Claim 28 recites a "downloaded app" with a particular configuration.

The Court therefore expressly rejects PNC's indefiniteness challenge, and PNC presents no alternative proposed construction.  The Court accordingly construes **"A system . . . the app**

associated with a bank and causing the customer's handheld mobile device to perform" to have its **plain and ordinary meaning**.

**6.  "the system configured to authenticate the customer using data representing a customer fingerprint"**

| "the system configured to authenticate the customer using data representing a customer fingerprint"<br>('638 Patent, Claims 20, 23) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. | "the system configured to confirm that the fingerprint data matches the bank's fingerprint data associated with the customer" |

(Dkt. No. 47, Ex. B, at 2; Dkt. No. 66, Ex. A2, at 11.)

(a)  The Parties' Positions

USAA argues: "The claims simply require authenticating the customer 'using data representing a customer fingerprint,' which could be done in other ways not requiring identifying a 'match' with the 'bank's fingerprint data associated with the customer.'  For example, matching of fingerprint data could occur on the customer's device, rather than the bank storing fingerprint data itself."  (Dkt. No. 50 at 11.)

PNC responds that "USAA's argument that 'matching of the fingerprint data could occur on the customer's device' is inconsistent with the claim language that distinguished the claimed 'system' from the customer's device."  (Dkt. No. 62 at 16 (citation omitted).)  PNC argues that "[t]he specification confirms that user authentication happens on the server-side (i.e., through the bank), not on the customer's device."  (*Id.*)

USAA replies that "[t]he customer's handheld device is explicitly part of the claimed 'system configured to authenticate the customer' and the specification confirms that the processes

- 26 -

running on the 'financial institution electronics' may 'operate in concert with' the processes running on the customer's handheld device."  (Dkt. No. 64 at 7 (citation omitted).)

At the March 2, 2022 hearing, PNC argued that the specification contains no disclosure of authentication at a user device.  On the contrary, PNC argued, all of the disclosed authentication happens at a bank server.  USAA responded that there is no reason to limit these claims to the particular embodiments disclosed in the specification.

(b)  Analysis

The parties agree that the preambles of Claims 20 and 23 of the '638 Patent are limiting. (*See* Dkt. No. 47, Ex. A; *see also* Dkt. No. 66-1, Ex. A2, at 16–17).  Claim 20 of the '638 Patent, for example, recites (emphasis added):

> 20.  A system for allowing a customer to deposit a check using a customer's handheld mobile device, *the system configured to authenticate the customer using data representing a customer fingerprint*, the system including:
>> a customer's handheld mobile device including a downloaded app, the app associated with a bank and causing the customer's handheld mobile device to perform the following steps:
>>> instructing the customer to take a photo of the check;
>>> using a display of the customer's handheld mobile device to assist the customer in taking the photo of the check;
>>> assisting the customer as to an orientation for taking the photo; and
>>> using a wireless network, transmitting a copy of the photo from the customer's handheld mobile device and submitting the check for mobile check deposit;
>> a bank computer programmed to update a balance of an account to reflect an amount of the check submitted for mobile check deposit by the customer's handheld mobile device;
>> the system being configured to check for errors before the submitting is performed by the customer's handheld mobile device; and
>> the system being configured to confirm that the mobile check deposit can go forward after optical character recognition is performed on the check in the photo.

Nothing in this claim language expresses or implies that authenticating the user requires using fingerprint data held by a *bank*.  PNC argues that this is implied by the "customer's handheld

- 27 -

mobile device" being recited as distinct from the "system," but a fair reading of the claim as a whole is that the recited "system" *includes* the customer's handheld mobile device.   The specification disclosures cited by PNC do not compel otherwise.   To whatever extent those disclosures express or imply that fingerprint data is held by a bank (*see* '638 Patent at Fig. 5), that is a specific feature of particular disclosed embodiments that should not be imported into the claims.  *See Phillips*, 415 F.3d at 1323.  Also, the specification discloses that programs running on the "financial institution electronics" may "operate *in concert with*" programs running on a customer's computer.  '638 Patent at 5:24–27 (emphasis added).

The Court therefore expressly rejects PNC's proposed construction and finds that no further construction is necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'n's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The analysis is the same with respect to Claim 23 of the '638 Patent.

The Court accordingly construes **"the system configured to authenticate the customer using data representing a customer fingerprint"** to have its **plain and ordinary meaning**.

**7. "check for errors"**

| **"check for errors"** ('638 Patent, Claims 1, 20) | |
|---|---|
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. | "check for errors related to the check image" |

(Dkt. No. 47, Ex. B, at 2; Dkt. No. 66, Ex. A2, at 13.)

<u>(a)  The Parties' Positions</u>

USAA argues that "[t]he plain meaning of 'check for errors' is sufficiently clear and no further construction is necessary, just as the Court determined with respect to the similar term 'checking for errors' in the patents-in-suit in the -319 case ([*PNC I*])." (Dkt. No. 50 at 11.)  USAA urges that "PNC's proposed construction here appears to be an attempt to revive the narrow interpretation it advanced—and the Court expressly rejected—in [*PNC I*]."  (*Id.* at 12.)

PNC responds that "PNC seeks a construction of 'check for errors' that is consistent with this Court's prior finding" that "checking for errors" refers to an error "related to the check image." (Dkt. No. 62 at 17.)  PNC argues that construction is necessary because: "USAA's understanding of the plain meaning of 'check for errors' includes 'identifying an account,' … but 'identifying an account' is not checking for errors *related to the check image*.  Identifying an account has nothing to do with the image of the check; it has to do with where the customer wants the check to go." (*Id.* at 18) (emphasis in original.)

USAA replies by emphasizing the Court's finding in *PNC I* that "the 'checking' could involve user input that is related to the check image, such as user input of a dollar amount

corresponding to the check."  (Dkt. No. 64 at 8.)   USAA further states: "PNC misconstrues USAA's brief.  USAA did not say that 'identifying an account' is 'checking for errors.'  Rather, 'identifying an account [or] identifying an amount of a deposit' are examples of information input by the user, which the system may examine to check for errors.  That is consistent with the Court's description of the plain meaning of 'check for errors' in *PNC I*."  (*Id*. at 8 (citations omitted).)

(b)  Analysis

Claim 1 of the '638 Patent recites (emphasis added):

1.  A system for allowing a customer to deposit a check using a customer's own handheld mobile device, the system including:
    a customer's handheld mobile device including a downloaded app, the app associated with a bank and causing the customer's handheld mobile device to perform the following steps:
        receiving input entered by the customer indicating an amount of the check;
        after the receiving, instructing the customer to take a photo of the check;
        using a display of the customer's handheld mobile device to assist the customer in having a digital camera take the photo of the check;
        assisting the customer as to an orientation for taking the photo;
        presenting the photo of the check to the customer after the photo is taken; and
        using a wireless network, transmitting a copy of the photo over the Internet from the customer's handheld mobile device and submitting the check for mobile check deposit in the bank after presenting the photo of the check to the customer;
    a bank computer programmed to update a balance of an account to reflect an amount of the check submitted for mobile check deposit by the customer's handheld mobile device;
    the system being configured to *check for errors* before the submitting is performed by the customer's handheld mobile device;
    the system being configured to confirm that the mobile check deposit can go forward after:
        optical character recognition is performed on the check in the photo, the optical character recognition including determining an amount shown on the check, and

> the amount determined by optical character recognition is
> compared to the amount entered by the customer; and
> the system being configured to update the balance of the account after
> optical character recognition is performed on a Magnetic Ink Character Recognition
> (MICR) line of the check in the photo.

In *PNC I*, as to other patents, the Court noted that the parties agreed that "'checking for errors' does not refer to an Internet connection error, for example, but rather refers to an error related to the check image." *PNC I* at 23.  The Court in *PNC I* also "expressly reject[ed] PNC's proposal of 'in the check image' because the 'checking' could involve user input that is related to the check image, such as user input of a dollar amount corresponding to the check." *Id.*  The Court there construed "checking for errors" to have its plain meaning. *Id.*

The Court reaches the same conclusion here as to the '638 Patent. *See, e.g.,* '638 Patent at 11:51–12:45 ("determining if there is an error in said deposit of said check," such as by validating a routing number, determining if a check was previously deposited, or comparing a customer-entered check amount to an OCR-determined check amount). PNC's proposed construction, by contrast, might be read as being limited to checking aspects of the check image itself, which would be inconsistent with the Court's above-noted findings in *PNC I*, which the Court finds applicable to the '638 Patent.

The Court therefore expressly rejects PNC's proposed construction and finds that no further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve

the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291; *Bayer*, 989 F.3d at 977–79.  As the Court found in *PNC I*, "'checking for errors' does not refer to an Internet connection error, for example, but rather refers to an error related to the check image," and "the 'checking' could involve user input that is related to the check image, such as user input of a dollar amount corresponding to the check."  *PNC I* at 23.

The Court accordingly construes **"check for errors"** to have its **plain and ordinary meaning**.

## 8.  "Personal Digital Assistant (PDA)"

| "Personal Digital Assistant (PDA)" ('638 Patent, Claims 7, 22, 25) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. | "a handheld computer with specialized software for use as a personal organizer" |

(Dkt. No. 47, Ex. B, at 2; Dkt. No. 66, Ex. A2, at 16 .)

(a)  The Parties' Positions

USAA argues that "[t]he term 'PDA' (short for 'personal digital assistant') is a well-known type of handheld, typically pen- or stylus-based computer and does not need any further construction," and "PNC's proposed construction improperly narrows the scope of the claims by requiring the claimed 'PDA' to have 'specialized software for use as a personal organizer,' which is not supported by anything in the intrinsic record."  (Dkt. No. 50 at 12–13.)

PNC responds that "USAA seeks to render this claim term meaningless," and "[t]he Court should construe 'Personal Digital Assistant' in a way that makes clear that not every handheld

mobile device is a PDA." (Dkt. No. 62 at 18.) PNC argues that "not every handheld mobile device is a PDA, because if it were, claim 7 would be coextensive in scope with claim 1," and PNC also submits that the specification discloses PDAs as one of several types of mobile devices. (*Id.* at 19.)

USAA replies that "[a] PDA is a type of handheld computer that is well-known in the art," and USAA argues that "PNC's construction would tie the scope of the invention to an end user's decision to install (or not install) 'personal organizer' software." (Dkt. No. 64 at 8.)

(b)  Analysis

The specification discloses:

[A]lthough the physical environment depicted may show the connected devices as computers, such illustration is merely exemplary and the physical environment may alternatively be depicted or described comprising various digital devices such as *PDAs*, televisions, MP3 players, etc., software objects such as interfaces, COM objects and the like.

'638 Patent at 8:40–47 (emphasis added).

USAA persuasively argues that the term "personal digital assistant" has been well known in the art. Although dependent Claim 7 of the '638 Patent recites "wherein the customer's handheld mobile device is a Personal Digital Assistant (PDA)," thereby demonstrating that not every handheld mobile device is a PDA, PNC does not persuasively justify limiting a "PDA" to a particular type of use, namely "for use as a personal organizer."

Any remaining issue regarding applying the "Personal Digital Assistant (PDA)" limitations to the accused instrumentalities relates to questions of fact regarding infringement rather than any question of law for claim construction. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper

construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

The Court therefore expressly rejects PNC's proposed construction and finds that no further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan*, 626 F.3d at 1207 ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291; *Bayer*, 989 F.3d at 977–79.

The Court accordingly construes **"Personal Digital Assistant (PDA)"** to have its **plain and ordinary meaning**.

## VI.    DISPUTED TERMS IN U.S. PATENT NO. 10,769,598

**9.  "method of facilitating remotely depositing funds into a user's account with a bank's computing system and without using an Automatic Teller Machine (ATM)," "A method of facilitating remotely depositing funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)," and "A system for facilitating remote deposit of funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)"**

<table>
<tr><td colspan="2">

**"method of facilitating remotely depositing funds into a user's account with a bank's computing system and without using an Automatic Teller Machine (ATM)"**

**"A method of facilitating remotely depositing funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)"**

**"A system for facilitating remote deposit of funds into a user's account via Internet-based communication without using an Automatic Teller Machine (ATM)"**

('598 Patent, Claims 1, 10, 15)

</td></tr>
<tr><td>**USAA's Proposed Construction**</td><td>**PNC's Proposed Construction**</td></tr>
<tr><td>Preambles are limiting</td><td>"without using an Automatic Teller Machine (ATM)" is not limiting</td></tr>
</table>

(Dkt. No. 47, Ex. B, at 3; Dkt. No. 66, Ex. A3, at 30.)

(a)  The Parties' Positions

USAA argues that these preambles are "necessary to give life, meaning, and vitality" to the claims, and "the restrictive element 'without using an Automatic Teller Machine (ATM)' is necessary to give effect to the specification's express disclaimer of Automatic Teller Machines as an embodiment of the inventions."  (Dkt. No. 50 at 13 (citations omitted).)

PNC responds that "USAA fails to provide sufficient reasoning to ignore th[e] general principle of claim construction" that "terms in a preamble are not limiting."  (Dkt. No. 62 at 20–21 (citation omitted).)  PNC argues that "the phrase 'without using an Automatic Teller Machine (ATM)' simply provides that a method of facilitating remote deposit can be done without using an

ATM," and "the claims of the '598 patent are structurally complete without these preamble phrases." (*Id.* at 21 (footnote omitted).)  Further, as to USAA's argument that the specification contains an express disclaimer, PNC argues that "different terms in the claims are presumed to have different meanings, suggesting that any alleged 'express disclaimer' that can be gleaned from how the specification describes customer-controlled devices would only apply to the term 'customer-controlled' and not the terms that exclude this language." (*Id.* at 22.)

USAA replies that "[t]he preamble language 'without using an Automatic Teller Machine (ATM)' makes clear that the recited 'customer device' and 'bank's computing system' are not ATMs, which is a specific limitation on the claims' scope selected by the inventor in drafting the claims and supported by the specification." (Dkt. No. 64 at 8–9.)

At the March 2, 2022 hearing, PNC submitted that each of these claims recites a "bank's computing system," and PNC argued that the specification nowhere excludes an ATM from being part of a bank's computer system.  USAA argued that the specification excludes ATMs from the scope of "customer-controlled" devices such as the customer devices recited in these claims.  *See* '598 Patent at 6:10–13 ("An example of a computer that would not be considered customer-controlled would be an Automatic Teller Machine (ATM) that is typically controlled by a bank or other business.").

(b)  Analysis

In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim.  *Pitney Bowes*[, *Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)].  Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.,*

*Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in

the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble

may act as a necessary component of the claimed invention."); *C.W. Zumbiel Co. v. Kappos*, 702

F.3d 1371, 1385 (Fed. Cir. 2012) (finding preambles limiting because "'containers' as recited in

the claim body depend on 'a plurality of containers' in the preamble as an antecedent basis").

Also, in some cases a preamble may be limiting if it states a "fundamental characteristic of

the claimed invention," "serves to focus the reader on the invention that is being claimed," or

"states the framework of the invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d

1331, 1343 (Fed. Cir. 2006).  A preamble may also be limiting if it sets forth a feature "underscored

as important by the specification." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed.

Cir. 2012) (quoting *Catalina*, 289 F.3d at 808).  Additionally, in some cases, "[w]hen a patent . . .

describes the features of the 'present invention' as a whole, this description limits the scope of the

invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019)

(quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

At the March 2, 2022 hearing, the parties presented argument regarding these claims as a

group.  As the Court expressed during the hearing, the differences between these claims warrant

individual consideration of each claim in light of the relevant authorities.

Turning first to Claim 1 of the '598 Patent, the claim recites (emphasis added):

> 1.  A *method of facilitating remotely depositing funds into a user's account with a bank's computing system and without using an Automatic Teller Machine (ATM)*, comprising:
>     providing a remote deposit application for download to a customer device, wherein the remote deposit application comprises computer-executable instructions that, when executed by a processor, provide a user-interface and control a camera associated with the customer device to facilitate capturing at least one electronic image of a check;

receiving at *the bank's computing system*, via the user-interface on the customer device: authentication data, an electronic identification of an account for receipt of a value associated with the check, an electronic indication of the value associated with the check, and the at least one electronic image of the check;

determining whether the check was previously deposited using the at least one electronic image of the check; and

initiating and/or logging a first deposit of the value to the account via *the bank's computing system* unless *the bank's computing system* determines from the at least one electronic image of the check that the check was previously deposited.

Here, the preamble provides antecedent basis for "the bank's computing system" recited in the body of the claim.

Nonetheless, "that [a] phrase in the preamble … provides a necessary structure for [the] claim … does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention." *TomTom Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015); *see id.* ("It was therefore error for the district court to use an antecedent basis rationale to justify converting this independent part of the preamble into a new claim limitation."); *see also Bio-Rad Labs., Inc v. 10X Genomics Inc.*, 967 F.3d 1353, 1371 (Fed. Cir. 2020).

In some cases, a preamble term that provides antecedent basis may be intertwined with other portions of the preamble that provide additional detail. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is defined in greater detail in the preamble as being 'representative of at least one sequential set of images of a spray plume.'").

Here, however, the subsequent preamble recital of "without using an Automatic Teller Machine (ATM)" is separated from the rest of the preamble by the word "and," and this disputed portion of the preamble does *not* provide additional detail regarding the part of the preamble that provides antecedent basis for a term in the body of the claim.  That is, even though the preamble provides antecedent basis for the "bank's computing system," the preamble does not set forth any

additional limitation or explanation regarding the "bank's computing system."  Any limitations as to the "bank's computing system" are recited in the body of the claim, not the preamble.

Thus, the applicable principle is "the presumption against reading a statement of purpose in the preamble as a claim limitation." *Marrin v. Griffin*, 599 F.3d 1290, 1294–95 (Fed. Cir. 2010); *see Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("Generally, the preamble does not limit the claims."); *see also Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 769–71 (Fed. Cir. 2018) (in preamble reciting "[a] computer network for providing an information delivery service for a plurality of participants," finding "information delivery service" to be non-limiting because it "merely describe[s] intended uses for what is otherwise a structurally complete invention").

Substantially the same analysis applies to Claim 15 of the '598 Patent.  In that claim, too, the preamble phrase "without using an Automatic Teller Machine (ATM)" is set forth as part of what is "facilitat[ed]" and thus is part of a "statement of purpose in the preamble" that is not limiting.  *Marrin*, 599 F.3d 1290.

USAA also does not persuasively show any disclaimer or other disclosure in the specification that would justify finding the preamble of Claim 1 or Claim 15 limiting as to "without using an Automatic Teller Machine."  *See* '598 Patent 4:35–39 & 6:10–13 ("An example of a computer that would not be considered customer-controlled would be an Automatic Teller Machine (ATM) that is typically controlled by a bank or other business.").

Claim 10 of the '598 Patent recites (emphasis added):

10.  A method of facilitating remotely depositing funds into a user's account *via Internet-based communication without using an Automatic Teller Machine (ATM)*, comprising:
        coordinating with a remote deposit application on a customer-controlled device to facilitate a deposit procedure including capturing, via a camera associated with the customer-controlled device, at least one electronic image of a check;

> validating authentication data provided via the customer-controlled device;
>
> receiving into a bank's computing system, via the customer-controlled device and *the Internet-based communication*:
>
>> an electronic identification of an account for receipt of a value associated with the check and an electronic indication of the value associated with the check, and the at least one electronic image of the check;
>
> determining whether the check was previously deposited using the at least one electronic image of the check; and
>
>> after validating the authentication data, triggering a deposit of the value to the account via the bank's computing system unless the bank's computing system determines from the at least one electronic image of the check that the check was previously deposited.

In this claim, the preamble provides antecedent basis for "the Internet-based communication" in the body of the claim, and the preamble provides additional detail that this "Internet-based communication" is "without using an Automatic Teller Machine (ATM)." *See Proveris*, 739 F.3d at 1373 ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is defined in greater detail in the preamble as being 'representative of at least one sequential set of images of a spray plume.'"). In other words, the preamble of Claim 10 does more than "merely provide[] context for the limitations." *Summit 6*, 802 F.3d at 1291. Instead, the patentee "use[d] both the preamble and the body to define the subject matter of the claimed invention." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

The Court therefore finds:

> **the preamble of Claim 10 is limiting**; and
>
> **the preambles of Claims 1 and 15 are not limiting**.

**10.  "electronic indication of the value" and "accept or determine amount data indicative of an amount of the check from the user owned device"**

| "electronic indication of the value" ('598 Patent, Cls. 1, 8, 10, 12) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. | "an indication of the check amount distinct from the amounts visible in the check image" |

| "accept or determine amount data indicative of an amount of the check from the user owned device" ('598 Patent, Cl. 15) | |
| --- | --- |
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. | "accept or obtain amount data distinct from the amounts visible in the check image from the user-owned device" |

(Dkt. No. 47, Ex. B, at 3; Dkt. No. 66, Ex. A3, at 35 & 36.)

(a)  The Parties' Positions

USAA incorporates its arguments as to the term "check amount indication" in the '136 Patent, which is discussed above.  (*See* Dkt. No. 50 at 14.)

PNC responds that "[t]hese claim terms require construction because USAA seeks to read them out of the claims entirely."  (Dkt. No. 62 at 23.)  PNC urges that "[t]he 'electronic indication of the value associated with the check' and 'amount data indicative of an amount of the check' must be distinct from data derived from the check image itself."  (*Id.*)  PNC argues that "the '598 patent's specification makes clear that there are separate ways for the value of a check to be ascertained, such as through a user's manual entry or through obtaining the value from an electronic image."  (*Id.*)  PNC also argues: "Because the OCR process occurs on the Financial

- 41 -

Institution Electronics and not the customer or user's computer, any 'electronic indication of the value associated with the check' or 'data indicative of an amount of the check' that is received at the 'bank's computing system' must come from the customer or user and not from image processing, like OCR.  This is because the OCR process does not occur until after the check image is received by the bank's computing system." (*Id.* at 24.)  PNC thus argues that "[o]f these distinct ways to enter the value, the claims require the customer or user's manual entry of the check amount." (*Id.*)

USAA replies that "the plain language of the claims requiring receiving or accepting data indicating the amount of the check from the user's device is understandable without further construction," and "[PNC's] limitation[s] appear nowhere in the claims and are unsupported by the intrinsic record."  (Dkt. No. 64 at 9.)  USAA urges that "[t]here is thus no basis to limit the scope of the claims to data created by what PNC concedes is only one of multiple examples in the specification of how the amount of a check can be ascertained." (*Id.*)

(b)  Analysis

These terms present essentially the same dispute as the term "check amount indication" in the '136 Patent, which is discussed above, and substantially the same analysis applies.  *See* '598 Patent at 11:63–67 ("comparing an OCR-determined amount to a customer-entered amount").  PNC's proposal would limit these claims to specific features of particular disclosed embodiments, such as limiting the amount data to being entered by a user rather than potentially being obtained by OCR, and such as limiting OCR to being performable only by the "Financial Institution Electronics."  *See id.* at Fig. 5.  PNC's proposal should therefore be rejected.  *See Phillips*, 415 F.3d at 1323.  Also, PNC cites the language of the claims themselves as demonstrating a distinction between a check image and an indication of a check amount, but this distinction does not demonstrate that the indication is necessarily entered by a user rather than obtained from the check image.  On the contrary, dependent Claim 12 of

the '598 Patent expressly recites "receiving the electronic indication of the value based on optical recognition of image data in the at least one electronic image of the check," and PNC does not persuasively show that OCR can be performed only by a bank and not by a customer device.

The Court accordingly construes these disputed terms as set forth in the following table:

| Term | Construction |
|---|---|
| **"electronic indication of the value"** | **"an indication of the check amount, wherein the indication is distinct from the check image but may have been obtained from the check image or from some other source"** |
| **"accept or determine amount data indicative of an amount of the check from the user owned device"** | **"accept or determine amount data indicative of an amount of the check from the user owned device, wherein the amount data is distinct from the check image but may have been obtained from the check image or from some other source"** |

**11. "receiving the electronic indication of the value as an embedded aspect of the at least one electronic image"**

| **"receiving the electronic indication of the value as an embedded aspect of the at least one electronic image"** (’598 Patent, Claim 8) | |
|---|---|
| **USAA's Proposed Construction** | **PNC's Proposed Construction** |
| No further construction necessary. Not indefinite. | Indefinite |

(Dkt. No. 47, Ex. B, at 3; Dkt. No. 66, Ex. A3, at 38.)

(a)  The Parties' Positions

USAA argues that "[a] person of ordinary skill in the art would have understood the meaning of receiving data as an 'embedded aspect' of an image; for example, image file formats such as 'JPEG' and 'TIFF' (both of which are referenced as exemplary check image formats in the

specification) could store metadata related to an image, such as date and time information, alongside the image data in the file." (Dkt. No. 50 at 15.)

PNC responds that "[a]ccepting USAA's position, then the 'embedded aspect' must also include the 'electronic indication of value,'" and PNC argues that "[n]either the claims nor specification describe how 'the electronic indication of the value' is ascertained from the 'embedded aspect.'" (Dkt. No. 62 at 27.)

USAA replies that "Claim 8 is … readily understood as requiring the electronic indication of the value to be transmitted as an embedded aspect of the image (such as, for example, embedded metadata), whereas in the independent claim the indication may be transmitted separately from the image … ." (Dkt. No. 64 at 10.)

At the March 2, 2022 hearing, USAA also cited disclosure in the specification regarding a "log file." *See* '598 Patent at 11:55–67 & 15:4–15.

(b)  Analysis

Claim 8 of the '598 Patent recites (emphasis added):

8.  The method of claim 1, wherein receiving the at least one electronic image of the check comprises *receiving the electronic indication of the value as an embedded aspect of the at least one electronic image*.

PNC's argument that "[n]either the claims nor specification describe how 'the electronic indication of the value' is ascertained from the 'embedded aspect,'" (Dkt. No. 62 at 27), may perhaps bear upon issues such as enablement or written description but does not demonstrate any indefiniteness. That is, PNC does not meet its burden to show any lack of reasonable certainty as to the scope of this claim. *See Nautilus*, 572 U.S. at 910; *see also Sonix*, 844 F.3d at 1377.

The Court therefore expressly rejects PNC's indefiniteness challenge, and PNC presents no alternative proposed construction.

The Court accordingly construes **"receiving the electronic indication of the value as an embedded aspect of the at least one electronic image"** to have its **plain and ordinary meaning**.

## VII.    CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**So ORDERED and SIGNED this 17th day of March, 2022.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE